Michael McConnell
Texas Bar I.D. 13447300
michael.mcconnell@kellyhart.com
Nancy Ribaudo
Texas Bar I.D. 24026066
nancy.ribaudo@kellyhart.com
Katherine T. Hopkins
Texas Bar I.D. 24070737
katherine.hopkins@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: 817/332-2500
Telecopy: 817/878-9774

*Proposed Counsel for Debtors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SOVRANO, LLC, | § | CASE NO. 19-40067-11 |
| MR. GATTI'S, LP, | § | CASE NO. 19-40069-11 |
| GATTI'S GREAT PIZZA, INC., | § | CASE NO. 19-40070-11 |
| GIGI'S CUPCAKES, LLC, | § | CASE NO. 19-40072-11 |
| GIGI'S OPERATING, LLC, | § | CASE NO. 19-40073-11 |
| GIGI'S OPERATING II, LLC,[1] | § | CASE NO. 19-40074-11 |
| | § | |
| Debtors. | § | **(Joint Administration Requested)** |
| | § | |
| _____ | § | **Emergency Hearing Requested** |

**DECLARATION OF DAWN M. RAGAN, CHIEF RESTRUCTURING OFFICER,
IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Dawn M. Ragan, hereby submits this declaration (the "Declaration") pursuant to 28

U.S.C. § 1746, and declare under penalty of perjury that:

1.      My name is Dawn M. Ragan.  I am over the age of twenty-one and am competent

to make this Declaration.  I am a Director at CR3 Partners, LLC ("CR3").  I have more than 25

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sovrano, LLC (1470); Mr. Gatti's, LP (0879); Gatti's Great Pizza, Inc. (6061); Gigi's Cupcakes, LLC (8356); Gigi's Operating, LLC (0621); and Gigi's Operating II, LLC (8396).

years of professional experience in financial advisory, turnaround management, and corporate finance, including as chief restructuring officer, chief financial officer, plan agent, trustee, and financial advisor in numerous engagements with financially distressed companies in various industries, including the restaurant and food service industry.

2.      In December 2018, CR3 was engaged by Sovrano, LLC ("Sovrano"), and its five affiliates, Mr. Gatti's, LP ("Mr. Gatti's"), Gatti's Great Pizza, Inc. ("Gatti's Pizza" and collectively, with Sovrano and Mr. Gatti's, "Gatti's" or the "Gatti's Debtors"), Gigi's Cupcakes, LLC ("Gigi's Cupcakes"), Gigi's Operating, LLC ("Gigi's Operating"), and Gigi's Operating II, LLC ("Gigi's Operating II" and collectively, with Gigi's Cupcakes and Gigi's Operating, "Gigi's" or the "Gigi's Debtors"), all debtors and debtors-in-possession in the above-captioned chapter 11 bankruptcy cases (the "Debtors" or the "Company") to provide restructuring, advisory services, and to provide a Chief Restructuring Officer.  Pursuant to that engagement, I have provided advisory services prior to the filing of the petitions, and have been acting as the Chief Restructuring Officer of the Company as of the filing of the chapter 11 petitions.  In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and employees.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

4.      I submit this Declaration in support of each Debtor's voluntary petition and the relief requested in the following emergency motions filed by the Debtors in connection with their bankruptcy petitions (collectively, the "First Day Motions"):

i.   Joint Emergency Motion for Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion");

ii.  Notice of Designation as Complex Chapter 11 Bankruptcy Cases ("Notice of Complex Case Designation";

iii. Joint Emergency Motion to Limit Notice ("Motion to Limit Notice");

iv.  Joint Emergency Motion to Extend Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules Extension Motion");

v.   Joint Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting § 364(c) and § 364(d) Liens and Super-Priority Administrative Claim, and (III) Setting a Final Hearing (the "Cash Collateral Motion");

vi.  Joint Emergency Motion for Order (I) Authorizing Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Checks and Business Forms, and (C) Continue Intercompany Arrangements and (II) Granting Related Relief (the "Cash Management Motion");

vii. Joint Emergency Motion for Order Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Administrative Obligations (the "Wage Motion");

viii. Joint Emergency Motion for Order Authorizing Debtors to (I) Honor Certain Prepetition Obligations to Customers, (II) Honor Prepetition Marketing Program with Franchisees; (III) Continue Certain Customer and Franchisee Programs and Practices, and (IV) Granting Related Relief (the "Customer Programs Motion"); and

ix.  Joint Request for Emergency Consideration of "First Day" Motions.

5.   Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my personal interaction with the Debtors' senior management and other of the Company's advisors, my review of relevant documents, business records, and my experience and knowledge of the Debtors' operations and financial conditions. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

# I. BACKGROUND

6.      Debtors commenced the chapter 11 cases to facilitate a quick turnaround and improvement in liquidity in order to create a fiscally stronger enterprise. Debtors' filings are the result of a combination of factors stemming from the acquisition of the Gigi's brand in 2016, leverage undertaken in connection with acquisition and growth of both brands, and operating losses at certain stores. The Companies and their advisors expect the Chapter 11 process will best facilitate the Companies' immediate liquidity needs and preserve the Mr. Gatti's Pizza and Gigi Cupcakes brands, store, restaurant and franchise operations, and jobs for employees as well as allow for the sale of certain assets of the Debtors.

## A.      The Debtors' Business and Operations

7.      Gatti's restaurants are family-oriented pizza restaurants and entertainment facilities. The founder, James Eure, originally opened his first restaurant called "The Pizza Place" in Stephenville, TX in 1964. In 1969 he moved to the Austin area and opened the very first "Mr. Gatti's Pizza" as a tribute to his wife's maiden name. In the early 1980's, Gatti's began to modify its traditional dine-in concept to include an "all-you-care-to-eat" buffet, and developed delivery/carry-out concepts. Later, Gatti's began to operate and offer franchises for buffet restaurants of varying sizes that included games and other amusements.

8.      In June 2015, Sovrano acquired the Gatti's franchise through its purchase of MGI Holdings, LP. Since that time, Sovrano has been operating the Gatti's franchise through Gatti's, LP and operating its corporate-owned restaurants through Gatti's Great Pizza, Inc., and other affiliated entities. Today, Gatti's employs approximately 99 restaurant employees and owns and operates 3 restaurants in 3 states, plus 73 franchised locations across 10 states. Gatti's

headquarters employs approximately 23 corporate employees through an affiliate, Food Business Services, LLC.

9.      Gigi's stores are bakery shops offering a variety of upscale cupcakes baked onsite, prepared and packaged specifically for delivery, take-out and onsite consumption. The founder, Gina Butler, originally opened her first cupcake store in Nashville, TN in 2008 and franchised Gigi's stores from May 2008 to May 2016.

10.      On or about June 1, 2016, Gigi's Cupcakes purchased the Gigi's franchise system from Gigi's Franchising, LLC. Gigi's employs approximately 61 store employees and operates six cupcake stores in Texas, Arkansas, and Tennessee. Gigi's Operating and Gigi's Operating II are the operators of the Gigi's franchise. The Gigi's headquarters employs approximately 20 employees through Food Business Services, LLC.

**B.      Debtors' Organizational Structure**

11.      The Debtors consist of six entities, all of which are part of the Gigi's and Gatti's organization, headquartered in Fort Worth Texas. Sovrano is the direct or indirect parent of Mr. Gatti's, LP, and Gatti's Great Pizza, Inc. KeyCorp, LLC, a non-debtor, is the parent of Gigi's Cupcakes and Gigi's Operating and indirect parent of Gigi's Operating II.

12.      Sovrano, Gigi's Cupcakes, Gigi's Operating, and Gigi's Operating II are each a Delaware limited liability company. Mr. Gatti's is a Texas limited partnership. Gatti's Pizza is a Texas corporation.

**C.      Prepetition Capital Structure**

13.      As described in greater detail below, the Debtors' significant funded debt obligations include the following:

- An approximate $20,250,000 loan from **Equity Bank** to borrowers **Sovrano** and **Mr. Gatti's, LP**, pursuant to that certain Term Loan Agreement dated June 28, 2018. Sovrano, Mr. Gatti's, LP and Great Gatti's Pizza, Inc. each executed Security

Agreements, pursuant to which Equity Bank asserts a lien against all business personal property including, but not limited to, accounts, inventory, instruments and equipment. As of the Petition Date, the approximate amount of indebtedness is $19,563.875.

- An approximate $9,250,000 loan from Equity Bank to borrowers Gigi's Cupcakes, LLC and Gigi's Operating, LLC, pursuant to that certain Term Loan Agreement dated June 28, 2018, secured by all business personal property including, but not limited to, accounts, inventory, instruments and equipment. As of the Petition Date, the approximate indebtedness is $9,006,693.

- An approximate $340,000 loan from Happy State Bank to borrowers Gigi's Operating, LLC, and Gigi's Operating II, LLC, pursuant to that certain Loan Agreement dated March 23, 2017, secured by all accounts, equipment, inventory and the other collateral and proceeds relating to the stores located in Southlake, Texas and Knoxville, Tennessee. As of the Petition Date, the approximate amount of indebtedness was $268,549.

- An approximate $2,500,000 loan from JPMorgan Chase Bank, N.A. to borrower Sovrano, LLC, pursuant to that certain Loan and Security Agreement dated July 13, 2016, secured by borrower's and Great Gatti's Pizza, Inc.'s specified equipment and proceeds thereof, located at two store locations. As of the Petition Date, the approximate indebtedness was $1,069,335.

14. Gatti's also has significant unsecured debt obligations in the approximate amount of $550,000, comprised primarily of trade debt, and unpaid obligations under various store leases.

15. Gigi's also has significant unsecured debt obligations in the approximate amount of $250,000, comprised primarily of trade debt, and unpaid obligations under various store leases.

16. The Debtors' primary assets consist of their cash and cash equivalents, inventory, accounts receivables, inventory, franchise agreements, trade names and business goodwill.

## D. Events Leading to Bankruptcy

17. The Companies failed to maximize revenues due in part to underperforming stores at several locations. Rather than close unprofitable stores resulting from market and location factors, the Companies continued to operate and subsidize those losses. These losses,

coupled with litigation and other legacy liabilities inherited from the Gigi's acquisition, created further strain on the Companies' revenues and liquidity. After attempts to obtain additional financing and new capital structure failed, the Companies eventually reached a liquidity crisis.

18.     Debtors chapter 11 filing is to address the Companies' liquidity crisis, as well as capital structure. As part of its cost-cutting measures, Gatti's and Gigi's have recently closed several unprofitable stores, and implemented staffing changes. Debtors expect to complete their operational turnaround and financial reorganization process in chapter 11 quickly.

## II.     FIRST DAY RELIEF

19.     Contemporaneously with the filing of this Declaration, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and minimize the adverse effects of the commencement of these Cases and expedite a swift and smooth restructuring of the Debtors' balance sheets. In connection with preparation for these bankruptcy proceedings, I reviewed each of the First Day Motions and I believe that the allegations contained in each are true and correct to the best of my knowledge, information, and belief. The requested relief is critical to the Debtors' ability to continue in operation, and therefore, necessary to avoid immediate and irreparable harm and maximize the return to their estates and creditors. A description of the First Day Motions, the relief sought therein, and the facts in support are detailed below.

### A.     Motion for Joint Administration

20.     I believe that the Debtors qualify for joint administration for procedural purposes because they are affiliates. Each Debtor is either the wholly owned subsidiary or parent or an affiliate of the other Debtors. The financial affairs and business operations of the Debtors are closely related. Entry of an order directing joint administration of these Chapter 11 Cases will obviate the need for duplicative notices, applications and orders, and will thereby save

considerable time and expense for the Debtors and result in substantial savings to their respective estates. Joint administration will, thus, promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

21. Based on these reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Joint Administration Motion.

**B.    Notice of Complex Case Designation**

22. I believe that these Chapter 11 Cases qualify as complex chapter 11 cases because the Debtors have total liabilities in excess of $10 million and there are more than 50 parties-in-interest in these Chapter 11 Cases. I believe that application of the Complex Chapter 11 Procedures to these cases will ensure appropriate notice of the filings in these cases, assist in the efficient administration of the Debtors' estates, and serve the best interests of the Debtors and their creditors and equity holders. Accordingly, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notice of Complex Case Designation.

**C.    Motion to Limit Notice**

23. The Debtors have also requested that the Court enter an order for limiting notice in order to streamline the distribution of notices and reduce the costs to the Debtors. Debtors seek to limit the parties upon whom notice must be served and designate the manner of service with respect to all matters for which the Bankruptcy Code and the Bankruptcy Rules authorize the Court to designate or limit the parties entitled to notice and the manner of service.

24. The Debtors propose to provide notice of any filing in these cases only to the following parties: (i) the Office of the United States Trustee for the Northern District of Texas; (ii) the Debtors and their counsel; (iii) the Debtors' secured creditors; (iv) the thirty (30) largest

unsecured creditors for the Debtors on a consolidated basis; (v) governmental entities having a regulatory or statutory interest in these cases; (vi) those persons who have formally appeared and requested notice and service in these proceedings pursuant to Bankruptcy Rule 2002; (vii) any party whose interests are directly affected; (viii) counsel for and the members of any official committees appointed by this Court; and (ix) any indenture trustee  The foregoing list shall not apply to, and shall not limit notice of: (i) the first meeting of creditors pursuant to section 341 of the Bankruptcy Code; (ii) the date fixed for filing proofs of claim; (iii) the hearing to consider approval of the disclosure statement and confirmation of a plan; (iv) the dates fixed for filing objections to the disclosure statement and plan; (v) the dates fixed to submit ballots for accepting or rejecting the plan; and (vi) any hearing on the dismissal or conversion of these Chapter 11 cases, if necessary.

25.     I believe that limiting notice is necessary and appropriate because there are more than 400 creditors and parties in interest.  Providing notice of all matters to numerous creditors and other parties in interest would: (i) delay the provision of notice in each particular instance; (ii) place a significant administrative burden on the Debtors' estates, and (iii) impede the consummation of transactions, negotiation of settlements, or the granting of other relief that may be advantageous to the Debtors' estates and their creditors.  Furthermore, providing notice of all matters to all creditors or potential creditors would unnecessarily increase the administrative costs of these Chapter 11 Cases.

26.     The requested relief will reduce the burden, complication, delay and cost to the Debtors' estates associated with providing notice of all matters to scores of creditors and other parties in interest.  The Debtors' proposed Notice Procedures[2] will mitigate the administrative

---

[2] All capitalized terms that are not defined herein shall have the meaning ascribed to them in the respective Motion.

burden that would otherwise be imposed upon the estates without diminishing creditor participation in the administration of these Chapter 11 cases.

27.     In addition, the Notice Procedures will not impair the right of a party whose interest is directly affected by a particular matter to receive all filings related to that matter.  The Notice Procedures will promote the Debtors' reorganization efforts by preserving assets that otherwise would be consumed by unnecessary copying costs, postage and related expenses.  For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Motion to Limit Notice.

**D.     Schedules Extension Motion**

28.     The Schedules Extension Motion requests an extension of the time periods in which the Debtors must file their schedules of assets and liabilities and statements of financial affairs ("Schedules and Statements").  CR3 will assist in prepration of the Schedules and Statements. The Schedules Extension Motion requests a one-month extension until February 18, 2019.  Given the complexity of their financial affairs and the large number of potential creditors and parties-in-interest, it will take substantial time, and more than fourteen (14) days, to analyze and compile the information needed to complete Debtors' Schedules and Statements.

29.     At this juncture, a one-month extension through February 18, 2019, should provide sufficient time for Debtors to prepare and file their Schedules.  Accordingly, the Debtors have requested that the Court establish February 18, 2019, as the date on or before which they must file their Schedules and Statements, without prejudice to the Debtors' right to seek further extensions from this Court, or to seek a waiver of the requirement of filing certain Schedules and Statements.

30. Based upon the foregoing, I believe that it is in the best interests of the Debtors, their estates and creditors, and all parties in interest that the Court grant the relief requested in the Schedules Extension Motion.

**E.     Cash Collateral Motion**

31. Sovrano, LLC, Mr. Gatti's, LP, Gatti's Great Pizza, Inc., Gigi's Cupcakes, LLC and Gigi's Operating, LLC are requesting approval to use cash collateral of Equity Bank subject to Court approval.[3] Without use of such funds, Debtors lack sufficient cash to meet ongoing obligations. Any interruption in Debtors' business operations would be devastating and would likely result in their inability to continue as a going concern and a consequent loss of significant value with respect to estate assets. Specifically, Debtors need immediate access to cash collateral to continue making timely payments to vendors, purchase inventory, pay employees and pay rent and ordinary operational expenses.

32. Debtors have faced a liquidity crisis as a result of underperforming stores and overhead. Previously, Debtors financed acquisitions through third-party financing from Equity Bank, Happy State Bank, and JPMorgan Chase Bank, N.A. and/or owner financing.

33. In connection with those loans, certain of the Debtors granted prepetition liens and security interest to Equity Bank, including cash collateral, under the following documents (collectively "Equity Bank Loan Documents" or Credit Agreement"):

- That certain Term Loan Agreement, dated June 28, 2018, and Term Note in the amount of $20,250,000, by and between Equity Bank, as lender, and Sovrano and Mr. Gatti's, LP, as borrowers;

- That certain Security Agreement, dated as of June 28, 2018, by and between Equity Bank and Sovrano;

---

[3] For purposes of the use of cash collateral, "Debtors" refers to all of the Debtors other than Gigi's Operating II, LLC.

- That certain Security Agreement, dated as of June 28, 2018, by and between Equity Bank and Mr. Gatti's, L.P.;

- That certain Security Agreement, dated as of June 28, 2018, by and between Equity Bank and Gatti's Great Pizza, Inc.;

- That certain Term Loan Agreement, dated June 28, 2018, and Term Note in the amount of $9,250,000, by and between Equity Bank, as lender and  Gigi's Cupcakes, LLC and Gigi's Operating, LLC, as borrowers;

- That certain Security Agreement, dated  as of June 28, 2018, by and between Equity Bank and Gigi's Cupcakes, LLC; and

- That certain Security Agreement, dated as of June 28, 2018, by and between Equity Bank and Gigi's Operating, LLC

34.     To secure the various loans with Equity Bank, the respective Debtors granted Equity Bank security interests (collectively, the "Pre-Petition Liens") in personal property as defined in the security agreements between Equity Bank and each Debtor (collectively, the "Pre-Petition Collateral"), including certain cash collateral ("Cash Collateral").

35.     In addition, certain of the Debtors also entered into loan agreements and security agreements with Happy State Bank and JP Morgan Chase Bank, N.A. with respect to certain equipment loans, secured by certain property and equipment set forth in the Motion and herein. Specifically, Debtors entered into the following:

- That certain Loan Agreement, dated March 23, 2017, and Promissory Note in the amount of $340,000, by and between Happy State Bank, as lender, and Gigi's Operating, LLC, and Gigi's Operating II, LLC, as borrowers;

- That certain Security Agreements dated March 23, 2017, by and between Happy State Bank and Gigi's Operating, LLC, with respect to certain property located at Gigi's Southlake, TX store location;

- That certain Security Agreements dated March 23, 2017, by and between Happy State Bank and Gigi's Operating II, LLC, with respect to certain property located at Gigi's Knoxville, Tennessee store location;

- That certain Loan and Security Agreement, dated July 13, 2016, and Interim Promissory Note in the maximum amount of  $2,500,000, by and among **JPMorgan Chase Bank,**

**N.A.** as lender, and **Sovrano, LLC**, as borrower and granting a security interest in certain equipment and property located at certain stores; and

- That certain Security Agreement, dated July 28, 2016, by and between JP Morgan Chase Bank, N.A. and Gatti's Great Pizza, Inc., granting a security interest in certain equipment and property located at certain stores.

36.     Equity Bank has consented to Debtors' use of Cash Collateral pursuant to the Budgets and proposed Interim Order which provides for adequate protection as set forth therein attached to the Cash Collateral Motion as Exhibits A-C. Debtors use of the Cash Collateral will not impact the liens or security interests of the other secured creditors, namely, Happy State Bank and JP Morgan Chase Bank.

37.     Approval of the use of Cash Collateral will provide Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses. Unless these expenditures are made, Debtors will be forced to cease operations which would result in substantial going concern value being destroyed. Without access to the use of Cash Collateral, Debtors ability to manage, administer and preserve the Debtors' estates would be immediately and irreparably harmed, thereby materially impairing the estates and creditors and possibility of a successful reorganization of these chapter 11 cases.

38.     For these reasons, approval of the Cash Collateral Motion is critical for reorganization.

**F.     Cash Management Motion**

39.     Through the Cash Management Motion, the Debtors seek authority to (i) maintain their existing Bank Accounts and Cash Management System; (b) continue using their existing business forms and checks; (c) continue to engage in intercompany transfers in the ordinary course of business and consistent with past practice; and (d) pay any undisputed pre-petition bank fees and continue to pay the bank fees in the ordinary course of business.

40.    The Debtors manage their cash, receivables, and payables through a centralized cash management system (the "Cash Management System").  The Cash Management System consists of 26 bank accounts (the "Bank Accounts"), each maintained at one of 6 different banks (the "Banks").  A list identifying each of the Bank Accounts, along with the type of account, the Bank at which such account is held, and the last four digits of each account number, is attached to the Cash Management Motion as **Exhibit A**.

41.    The Debtors use the Cash Management System to efficiently collect, transfer, and disburse funds generated from their operations.  The Debtors maintain accounting controls with respect to each of the Bank Accounts and are able to accurately trace the funds through their Cash Management System to ensure that all transactions are adequately documented and readily ascertainable, including in connection with intercompany transfers as subsequently described herein.  The Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date. Accordingly, I believe that the Debtors will be able to accurately document, record, and trace the transactions occurring within the Cash Management System for the benefit of their bankruptcy estates (the "Estates") and for all parties in interest.

42.    **Bank Accounts:** The Bank Accounts are described in the following table:

| Accounts | Description of Accounts |
| --- | --- |
| ***Sovrano, LLC, Mr. Gatti's, LP, and Gatti's Great Pizza, Inc.*** | |
| Concentration   Operating Account | The Gatti's Debtors maintain a concentration account (the "Gatti's Concentration Account") with Equity Bank.[4]   The Gatti's Concentration Account is the central operating account for the Gatti's Debtors.  The |

---

[4] The Gatti's Debtors maintain an additional concentration account with JPMorgan Chase.  This account, however, has very little activity.

| | |
|---|---|
| | Gatti's Concentration Account is the recipient of payments in the form of deposits from the Restaurant Depository Accounts, payments received from credit card processors and other sources of revenue for the Gatti's Debtors.<br><br>In addition, franchisee royalty revenue due to Mr. Gatti's, LP pursuant to various agreements among Mr. Gatti's, LP and certain franchisees is deposited into the Gatti's Concentration Account. |
| Restaurant Depository Accounts | The Gatti's Debtors maintain separate Bank Accounts for the restaurants depending on region and location (the "<u>Restaurant Depository Accounts</u>").  For example, in the DFW Metroplex, there is one Restaurant Depository Account held with JPMorgan Chase Bank in which all of the Gatti's Debtors' restaurants deposit cash receipts.   In total, there are 4 Restaurant Depository Accounts.  The Gatti's Debtors sweep the Restaurant Depository Accounts on a regular basis, as needed.   The Gatti's Debtors' Restaurant Depository Accounts are maintained with the following Banks:<br><br>1. Equity Bank<br>2. JPMorgan Chase Bank<br>3. Ciera Bank<br>4. Prosperity Bank<br><br>Payroll for store employees of the Gatti's Debtors is paid from the Restaurant Depository Accounts.<br><br>The balance of the Restaurant Depository Accounts typically does not exceed $25,000, but may periodically exceed this amount. |
| Accounts Payable Accounts | The Gatti's Debtors maintain 4 accounts payable accounts (2 for store accounts payable and 2 for corporate accounts payable) with JPMorgan Chase Bank and Equity Bank (collectively, the "<u>Gatti's AP Accounts</u>").  As needed, funds are transferred from the Restaurant Depository Accounts to the Gatti's AP Accounts.<br><br>The majority of the Gatti's Debtors' checks (except for payroll-related checks) issue from the Gatti's AP |

| | |
|---|---|
| | Accounts. The Gatti's Debtors are able to monitor the issuance of outstanding checks through the Gatti's AP Accounts. |
| Gift Card Account | The Gatti's Debtors maintain a Gift Card account (the "Gatti's Gift Card Account") with Equity Bank for the collection of gift card revenue and payments processed by the third-party processor Valutec. The Gatti's Gift Card Account is swept to or funded from the Gatti's Concentration Account on a monthly basis. |
| Marketing/Media Fund Accounts | The Gatti's Debtors maintain a marketing fund account with JPMorgan Chase Bank and Equity Bank and a media fund account with Equity Bank (collectively, the "MM Accounts"). Franchisees deposit certain funds representing marketing and media obligations into the MM Accounts (1% of net sales into the marketing account and 1% of net sales into the media account). MM Accounts are used to pay accounts payable, among other things. <br><br> In addition, certain amounts from the MM Accounts are swept on a biweekly basis to the Gatti's Concentration Account to satisfy payroll for marketing employees. |
| **Gigi's Cupcakes, LLC, Gigi's Operating, LLC, and Gigi's Operating II, LLC** | |
| Concentration Operating Account | The Gigi's Debtors maintain a concentration account (the "Gigi's Concentration Account") with Equity Bank. The Gigi's Concentration Account is the Gigi's Debtors central operating account and is the recipient of various payments made to the Gigi's Debtors. Such payments include deposits from the Store Depository Accounts, as well as payments received from credit card processors and other sources of revenue for the Gigi's Debtors. <br><br> In addition, franchisee royalty revenue due to Gigi's Cupcakes, LLC pursuant to various agreements among Gigi's Cupcakes, LLC and certain franchisees is deposited into the Gigi's Concentration Account. |

| | |
|---|---|
| Store Depository Accounts | The Gigi's Debtors maintain separate Bank Accounts for the restaurants depending on region and location (the "<u>Store Depository Accounts</u>"). For example, in the DFW Metroplex, there is one Restaurant Depository Account held with JPMorgan Chase Bank in which all of the Gigi's Debtors' DFW restaurants deposit cash receipts. In total, there are 4 Store Depository Accounts. The Gigi's Debtors sweep the Store Depository Accounts on a regular basis, as needed. The Gigi's Debtors' Store Depository Accounts are maintained with the following Banks:<br><br>1. Equity Bank<br>2. JPMorgan Chase Bank<br>3. Regions Bank<br>4. Bank of America<br><br>The balance of the Store Depository Accounts typically does not exceed $10,000, but may periodically exceed this amount. |
| Accounts Payable Accounts | The Gigi's Debtors maintain accounts payable accounts with Equity Bank for both store and corporate level accounts payable (collectively, the "<u>Gigi's AP Accounts</u>"). As needed, funds are transferred from the Store Depository Accounts and Gigi's Concentration Account to the Gigi's AP Accounts.<br><br>The majority of the Gigi's Debtors' checks (except for payroll-related checks) issue from the Gigi's AP Accounts. The Gigi's Debtors are able to monitor the issuance of outstanding checks through the Gigi's AP Accounts. |
| Gift Card Account | The Gigi's Debtors maintain a Gift Card account (the "<u>Gigi's Gift Card Account</u>") with Equity Bank for the collection of gift card revenue and payments processed by the third-party processor Synergy World. The Gigi's Gift Card Account is swept to or funded from the Gigi's Concentration Account on a monthly basis. |
| Marketing Fund Account | The Gigi's Debtors maintain a marketing fund account with Equity Bank (the "<u>Marketing Account</u>"). Franchisees deposit certain funds representing marketing obligations into the Marketing Account |

|  | (2.5% of net sales into the Marketing Account). The Marketing Account is used to pay accounts payable, among other things. |
|  | In addition, certain amounts from the Marketing Account are swept on a biweekly basis to the Gigi's Concentration Account to satisfy payroll for marketing employees. |
| E-Commerce Account | The Gigi's Debtors also maintain a bank account for e-commerce transactions (the "E-Commerce Account"), which are made through an online fulfilment center. The E-Commerce Account is held with Equity Bank and is swept to the Gigi's Concentration Account on a monthly basis. |

43.     Credit card purchases made online or at Gatti's Debtors' stores are processed by a company called Vantiv and Paymentech.  Prior to the Petition Date, funds from these purchases were deposited directly into the Gatti's Concentration Account at Equity Bank (3175).

44.     Credit card purchases made online or at Gigi's Debtors' stores are also processed by Paymentech.  Prior to the Petition Date, funds from these purchases were deposited directly into the Gigi's Concentration Account at Equity Bank (4449).

45.     In addition, each of the Debtors' restaurant and/or store locations possesses cash drawers for petty cash purposes.  The Gatti's Debtors possess approximately $1,000.00 – 4,000.00 per store and the Gigi's Debtors possess approximately $200.00 – 400.00 per store of petty cash for purposes of making change in cash transactions.  Such petty cash is carried on the Debtors' books and records but is not tied to a particular Bank Account.  The Debtors estimate that approximately $7,000 in petty cash exists.

46.     The Debtors respectfully request that the Court authorize Debtors to maintain and continue to use the Bank Accounts, and direct their Banks to maintain, service and administer the Bank Accounts in the ordinary course of business.  In this regard, the Debtors request that the

Banks be authorized and directed to receive, honor, and pay any and all checks, wire transfers, automatic clearinghouse payments, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, provided that sufficient funds are on deposit in the applicable Bank Accounts to cover such payments. Notwithstanding the foregoing, any check, advice, draft, or other notification that the Debtors advise the Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honoured by the Banks only to the extent authorized by order of the Court.

47.     **Compliance with Bankruptcy Code and U.S. Trustee Guidelines:**  To the best of my knowledge, each Bank Account is maintained at a Bank that is insured by the Federal Deposit Insurance Corporation (the "FDIC") and, therefore, complies with §345(b) of the Bankruptcy Code.

48.     I understand that the U.S. Trustee requires debtors to, among other things, deposit all estate funds with a financial institution that is an authorized depository approved by the U.S. Trustee and that agrees to comply with the requirements of the U.S. Trustee.

49.     Here, nine of the Debtors' Bank Accounts are maintained with Banks identified on the Authorized Depository Listing for the Northern and Eastern Districts of Texas.[5] However, the majority of the Debtors' Bank Accounts are with Banks that are not listed as authorized depository institutions in the Northern District of Texas. Specifically, 17 of the Debtors' Bank Accounts are held with the following banks, which are not included on the list of depository institutions: Equity Bank, Ciera Bank, and Bank of America. In particular, the accounts relating to the Concentration Accounts, certain Depository Accounts, certain Accounts Payable, and Gift Card Accounts are with Equity Bank. Re-establishing these Bank Accounts in

---

[5] These Banks include Prosperity Bank, JPMorgan Chase Bank, N.A., and Regions Bank.

the future would severely interrupt the Debtors' business operations and may prove costly to the Debtors. The Debtors respectfully request that the Court authorize the Debtors to maintain, service, and administer these Bank Accounts, without interruption in the ordinary course of business, notwithstanding the fact that such Bank Accounts are not with Banks that are listed as authorized depository institutions under the U.S. Trustee Guidelines.

50. **Checks and Business Forms:** In the ordinary course of business, the Debtors utilize numerous preprinted business forms (the "Business Forms"). The Debtors would have to expend significant time and resources to add a reference to their status as debtors in possession to these Business Forms. To minimize expenses to their Estates, the Debtors request that the Court authorize their continued use of all correspondence and Business Forms (including, but not limited to, letterhead, purchase orders, invoices, and preprinted and future checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as required by the U.S. Trustee Guidelines. However, the Debtors will add a debtor-in-possession stamp to non-payroll checks. Further, to the extent the Debtors exhaust their existing supply of Business Forms during these chapter 11 cases, the Debtors will transition to using checks and other Business Forms with the designation "debtor-in-possession" and the corresponding bankruptcy case number on all such forms.

51. **Bank Fees:** In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Accounts, a number of fees, charges, and expenses related to the cost of administering the Bank Accounts, including, *inter alia*, wire transfer and other fees, costs, and expenses standard for a typical corporate bank account (collectively, the "Bank Fees"). The Bank Fees are either debited directly from the Debtors'

Bank Accounts or are paid in connection with wire transfers. The Debtors paid the Banks approximately $2,500 per month in Bank Fees on average for the last six months. The Debtors estimate that they owe the Banks approximately $2,500.00 as of the Petition Date. Furthermore, the Debtors estimate that $1,000.00 on account of Bank Fees will become due and payable during the first twenty-one days of the case. The Debtors seek permission to pay these Bank Fees and to continue paying the Bank Fees on a final basis in accordance with past practices.

52. **Intercompany and Other Transfers:** Debtors make certain intercompany transfers of funds to other Debtors[6] and a non-debtor payroll entity, FBS, in the ordinary course of business (together with the intercompany transfers, the "Transfers"). In the ordinary course of business, Gatti's Debtors may transfer funds from their respective Bank Accounts to Bank Accounts held by other Gatti's Debtors and Gigi's Debtors may transfer funds from their respective Bank Accounts to Bank Accounts held by other Gigi's Debtors, as necessary to fund operations.

53. In addition, Debtors make certain transfers to a non-debtor payroll entity, Food Business Services, LLC ("FBS"), in the ordinary course of business. As more particularly described in the Debtors' Motion to pay prepetition wages, Debtors Mr. Gatti's, LP and Gigi's Cupcakes, LLC executed pre-petition agreements with FBS in connection with payroll services (the "Payroll Agreements"). Pursuant to those Payroll Agreements, Debtors Mr. Gatti's, LP and Gigi's Cupcakes, LLC transfer funds from their respective Concentration Accounts to FBS's bank account in order to compensate corporate employees who provide services to the Debtors but are employed by FBS. Using such funds, FBS transfers funds, either via wire or ACH transfer, to Paylocity, who then issues payment to the Debtors' corporate employees for their

---

[6] The Gatti's Debtors only make intercompany transfers between the other Gatti's Debtors and the Gigi's Debtors only make intercompany transfers between the Gigi's Debtors.

services provided to the Debtors. The transfers to FBS from the Debtors are significant to accomplishing the payment of the corporate employees and are integral in ensuring that the workforce has adequate monetary provisions. As a result, the Debtors request that the Court authorize them to continue such practices post-petition.

54. I believe that the Transfers are integral to the Debtors' operations because they effectuate payment to employees that provide services to the Debtors and represent a valuable source of revenue for use in the Debtors' operations. If the Transfers were discontinued, it would result in an unnecessarily disruption of the Debtors' operations and workforce as well as potentially delay the receipt of certain forms of revenue.

55. Further, requiring the Debtors to cease the Transfers would be a costly and time-consuming endeavor. The Debtors would be required to, among other things: (i) modify their internal accounting systems; (ii) expend employee time adjusting the Debtors' treasury and accounting functions; (iii) open new bank accounts; (iv) put new general ledgers in place; and (v) coordinate regarding new payment methods for employees. Such disruptions to the Cash Management System and the Debtors' operations would be detrimental to the Debtors, their creditors, and other stakeholders. Debtors request authority to continue these Transfers in the ordinary course of business.[7]

56. I believe that waiver of certain of the requirements of the U.S. Trustee Guidelines is appropriate. Maintenance of the Bank Accounts and Cash Management System will minimize the disruption of the Debtors' operation and promote an orderly and efficient transition into chapter 11. Such benefits are entirely consistent with the goals underlying the U.S. Trustee

---

[7] Although the Cash Management Motion articulates an overview of typical transfers of the Debtors, the relief requested herein is applicable to all Transfers and is not limited to solely the Transfers described in the Cash Management Motion. To the extent there are any outstanding prepetition obligations related to Transfers not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

Guidelines. Debtors' Cash Management System is an ordinary course, essential business practice that provides the significant benefits to Debtors outlined above. The Debtors believe that their post-petition operations will be smoother and more orderly if Debtors are allowed to maintain the Cash Management System. Any disruption of this system could have a severe and adverse impact upon the Debtors' businesses.

57. The continued use of these bank accounts is important to the Debtors' business operations and their goal of maximizing the value thereof to facilitate an effective reorganization. Requiring the Debtors to open new bank accounts, especially at this early stage of these Chapter 11 cases, would be an unnecessary expense, impose a needless administrative burden, and cause undue disruption. Any such disruption could adversely affect the Debtors ability to reorganize for the benefit of creditors and other parties in interest. Moreover, such a disruption would be wholly unnecessary insofar as the continued use of the Debtors' Bank Accounts and Cash Management System provides a safe, efficient, and established means for the Debtors to maintain and manage their cash. Maintaining these Bank Accounts is therefore in the best interests of the Debtors' estates, creditors, and other interested parties.

58. Furthermore, Debtors request the authorization to implement reasonable changes to the Cash Management System as they deem appropriate, including closing any existing bank accounts or opening new accounts. The Debtors request that this relief extend to any new accounts and that any new accounts are deemed to be bank accounts that are subject to such relief. The Debtors also request that the banks at which Debtors currently maintains accounts be authorized to honor any request to close any existing account or open a new account. In addition, the Debtors intend to use their best efforts to segregate cash generated from non-debtor entities from the cash generated from Debtor entities.

59.     To minimize expenses and avoid unnecessarily confusing their employees, customers, and suppliers, the Debtors believe it is appropriate that they be permitted to use their checks and other business forms as such forms were in existence as of the Petition Date without reference to the Debtors' status as debtors-in-possession or their bankruptcy case numbers. Requiring the Debtors to alter these business forms or make new forms would cause delay and result in the Debtors incurring significant expense early in these Chapter 11 cases.

60.     I believe that the Transfers between the Debtors as well as the transfers between the Debtors and FBS occur "in the ordinary course of business".  Out of an abundance of caution, the Debtors seek express authority to engage in such transactions on a postpetition basis. The transfers are not simply a matter of routine in the Debtors' business.  Rather, they are the type of transactions that are common among many complex business enterprises that operate through multiple affiliates.  However, and because of their routine nature, the transfers are integral to the Debtors' ability to operate their business as they are the source of valuable revenue for use in the Debtors' operations.  Further, they compensate employees that provide necessary services to the Debtors.  Accordingly, and out of an abundance of caution, the Debtors request express authority to engage in such transfers postpetition.

61.     The Debtors also request that the Court grant administrative expense status, subject and junior to the claims, including adequate protection claims, granted in connection with any order of this Court approving the Debtors' postpetition use of cash collateral, to all intercompany claims against a Debtor by another Debtor that arise postpetition as a result of a transfer.  If transfers are accorded administrative expense status, each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its own ordinary-course transactions.

62. Accordingly, I believe it is in the best interests of the Debtors, the estates and creditors, and all other parties in interest that the Court grant the relief requested in the Cash Management Motion.

**G.     Wage Motion**

63. The Debtors rely on the services of employed personnel (each, an "Employee" and collectively, the "Employees") to conduct their business operations, and the Debtors incur obligations to or on account of such Employees in the ordinary course of business.

64. **Employment and Compensation:** As of the Petition Date, the Debtors and FBS, a non-Debtor strictly pass-through entity, employ the following respective Employees in the course of the Debtors' enterprise:

| Entity | Full-Time Employees | Part-Time Employees | Hourly Employees | Salaried Employees | Total Employees[8] |
|---|---|---|---|---|---|
| Gatti's Great Pizza, Inc. | 39 | 60 | 93 | 6 | 99 |
| Gigi's Operating, LLC | 11 | 40 | 47 | 4 | 51 |
| Gigi's Operating II, LLC | 3 | 7 | 10 | 0 | 10 |
| Food Business Services, LLC | 43 | 0 | 0 | 43 | 43 |
| Totals: | 96 | 107 | 150[9] | 53[10] | 203 |

---

[8] The number of employees contained herein are approximate amounts to the best of the Debtors' knowledge.

[9] The Debtors' hourly employees shall be collectively referred to herein as the "Hourly Employees".

[10] The Debtors' salaried employees shall be collectively referred to herein as the "Salaried Employees".

65.     Hourly Employees are paid each pay period, which is weekly, with one week in arrears.  Salaried Employees are paid each pay period, which is bi-weekly, with two weeks in arrears.

66.     The Employees identified as employees of FBS include the Corporate Employees (as subsequently defined below) that provide services to the underlying Debtors.  FBS is purely a pass-through entity.  While not a debtor entity, FBS employs the identified Corporate Employees that provide direct services to the underlying Debtors.  Approximately 23 Salaried Employees are allocated to support the operations of the Gatti's Debtors and 20 are allocated to support the operations of the Gigi's Debtors.  Also, and pursuant to payroll agreements, the Debtors submit payment to FBS, who in turn transfers funds to Paylocity, which pays the Corporate Employees, for such services provided to the Debtors.

67.     As of the Petition Date, the Debtors' average gross payroll for the various employees is stated as follows:

| Entity | Average Gross Payroll for Hourly Employees | Average Gross Payroll for Salaried Employees | Total Averge Gross Payroll for Employees[11] |
|---|---|---|---|
| Gatti's Great Pizza, Inc. | $20,102.12 | $6,412.85 | $26,514.97 |
| Gigi's Operating, LLC | $16,294.99 | $1,058.00 | $17,352.99 |
| Gigi's Operating II, LLC | $3,400.00 | $0.00 | $3,400.00 |

---

[11] The number of employees contained herein are approximate amounts to the best of the Debtors' knowledge.

| Food Business Services, LLC | $0.00 | $154,426.00 | $154,426.00[12] |
|---|---|---|---|
| Totals: | $39,797.11 | $161,896.85 | $201,693.96 |

68.     Through their engagement of the Employees, the Debtors incur obligations to pay employee compensation, administrative fees, expenses, and payroll taxes.

69.     It is essential that the Debtors continue to honor their Obligations (as defined below) to ensure the continued operation of the Debtors' business and to maintain the morale of their workforce.  The Debtors face the imminent risk that operations may be severely impaired if they are not immediately granted authority to honor the obligations described herein.  Absent the requested relief, many of the employees may be unable to meet personal obligations, may be left without medical insurance, or may seek alternative employment opportunities.  Honoring the Obligations will, therefore, minimize business disruption and preserve employee loyalty during these cases.

70.     In the ordinary course of business, the Debtors provide certain wages, salaries, and other compensation to the Employees detailed below as "Employee Compensation".  Also, the Debtors provide certain allocations and/or reimbursements for expenses incurred while Employees perform their employment duties (the "Expense Reimbursement").  The Employee Compensation and Expense Reimbursement, along with the Deductions (defined below), Payroll Taxes and other Withholdings (both defined below), and any related obligations and administrative expenses outlined or referenced in this Section IV of the Wage Motion, are defined herein as the "Payment Obligations".

---

[12] Approximately $79,684.34 of the gross payroll is allocated to Salaried Employees that support the operations of the Gatti's Debtors and approximately $74,741.66 is allocated to the Salaried Employees that support the operations of the Gigi's Debtors.

71. The Debtors' Employees can generally be categorized as Store Employees (as defined below), who work in and/or manage the Debtors' restaurants and/or stores, or Corporate Employees (as defined below), who generally work in the Debtors' corporate offices.

72. The Debtors engage Salaried Employees and Hourly Employees to work in or manage the Debtors' restaurant and store locations (collectively, the "Store Employees"). The Store Employees include personnel holding various positions ranking from general managers to hourly crew. The roughly 160 Store Employees make up the bulk of the Debtors' workforce. As identified above, the Debtors employ the following amount of approximate Store Employees: Gatti's Great Pizza, Inc. employs 99 Store Employees; Gigi's Operating, LLC employs 51 Store Employees; and Gigi's Operating II, LLC employs 10 employees. Certain Store Employees may be entitled to receive overtime for hours worked over 40 hours per week at a rate of 1.5 times the regular hourly rate.

73. The Debtors last paid payroll on January 4, 2018[13]. The next payroll will be paid on January 11, 2019. Because Hourly Employees are paid in arrears, a portion of the January 11, 2019 payroll will be attributed to work performed prepetition. Likewise, a portion of the Salaried Employees' pay will be attributed to the prepetition period.

74. Debtors estimate that, as of the Petition Date, a total of approximately $38,754.60 in prepetition Employee Compensation to Store Employees has accrued but remains unpaid. The total prepetition Employee Compensation is more specifically broken down as follows: (i) $21,712.44 in prepetition Employee Compensation for Gatti's Great Pizza, Inc.; (ii) $14,452.04 in prepetition Employee Compensation for Gigi's Operating, LLC; and (iii) $2,590.12 in prepetition Employee Compensation for Gigi's Operating II, LLC. The Debtors anticipate that

---

[13] This payroll was paid prior to the commencement of these bankruptcy cases.

all of this amount will become due and payable to the Store Employees for Employee Compensation during the 21 days following the Petition Date.

75.     In addition, the Debtors maintain a staff of approximately 43 Employees who are not considered Store Employees, the bulk of whom work from the Debtors' corporate headquarters located in Fort Worth, Texas (the "Corporate Employees").  The Corporate Employees include support center personnel, as well as executives who generally oversee operations at multiple restaurant and/or store locations.  All of the Corporate Employees are employed on a full-time basis.  Corporate Employees provide a variety of management, administrative, operational, and other support services for the Debtors, including but not limited to, accounting, information technology, human resources, marketing, and other services.  All 43 Corporate Employees are paid on a salaried basis.

76.     The Debtors last paid payroll on December 31, 2018 for the period December 10, 2018 through December 23, 2018.  The next payroll will be paid on January 11, 2019.  As of the Petition Date, the accrued, unpaid amount of the Employee Compensation owed to Corporate Employees is approximately $143,393.39 ($63,093.09 for the Corporate Employees of the Gigi's Debtors and $80,300.30 for the Corporate Employees of the Gatti's Debtors).  The Debtors anticipate that all of this amount will become due and payable to the Corporate Employees on account of Employee Compensation during the twenty-one days following the Petition Date.

77.     The Store Employees' and Corporate Employees' skills and knowledge of the Debtors' operations are essential to the continued preservation of the Debtors' business, and their ongoing, uninterrupted services are vital to the Debtors' reorganization efforts and the preservation of the Debtors' estates.  The Debtors do not believe that any of the Employees are owed amounts in excess of the $12,850.00 statutory priority cap provided by section

507(a)(4)(A) of the Bankruptcy Code on account of Employee Compensation. Nevertheless, in an abundance of caution, the Debtors seek authority to satisfy any unpaid prepetition Employee Compensation to the extent such obligations exist of up to $12,850.00 on an interim basis and any remaining unpaid Employee Compensation in excess of the $12,850.00 statutory priority cap provided by section 507(a)(4)(A) of the Bankruptcy Code in the ordinary course of business, upon entry of an order (and after notice to and consultation with the U.S. Trustee).

78.     For each applicable pay period, the Debtors deduct certain amounts from the Employees' paychecks (collectively, the "Deductions"), including, without limitation: (i) pre-tax contributions to health and dependent care, as described in detail below; (ii) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed below; and (iii) other miscellaneous deductions. The Debtors estimate that they withhold, on average, approximately $17,590.76 in connection with the employment of the Corporate Employees, per pay period in Deductions from Corporate Employees' paychecks. With respect the Store Employees, the Debtors estimate that, per pay period, they withhold Deductions from the Store Employees' paychecks in the following approximate amounts: $1,760.00 for Gatti's Great Pizza, Inc. Store Employees; $532.00 for Gigi's Operating, LLC Store Employees; and $93.00 for Gigi's Operating II, LLC Store Employees. The Debtors estimate that, as of the Petition Date, the total amount of accrued, but unpaid Deductions is approximately as follows: $1,470.92 for Gatti's Great Pizza, Inc. Store Employees; $423.16 for Gigi's Operating, LLC Store Employees; $74.88 for Gigi's Operating II, LLC Store Employees; and $16,108.58 for Debtors' Corporate Employees.

79.     The Debtors are also required by law to:  (i) withhold certain amounts from Employees' wages on account of, among other things, federal income tax, Social Security, and

Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities; and (ii) make matching payments for Social Security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (collectively, the "Payroll Taxes"). Debtors estimate that, per pay period, they withhold Payroll Taxes from Employee Compensation in the following approximate amounts: $26,358.44 for Corporate Employees; $3,435.00 for Gatti's Great Pizza, Inc. Store Employees; $2,494.00 for Gigi's Operating, LLC Store Employees; and $397.00 for Gigi's Operating II, LLC Store Employees. In addition, the Debtors estimate that, per pay period, they pay the employer portion of Payroll Taxes in the following approximate amounts: $8,844.82 for Corporate Employees; $2,249.25 for Gatti's Great Pizza, Inc. Store Employees; $1,449.04 for Gigi's Operating, LLC Store Employees; and $263.72 for Gigi's Operating II, LLC Store Employees. The Debtors estimate that, as of the Petition Date, the total amount of accrued but unpaid Payroll Taxes is approximately as follows: $36,308.42 for Corporate Employees; $4,361.16 for Gatti's Great Pizza, Inc. Store Employees; $3,108.53 for Gigi's Operating, LLC Store Employees; and $383.12 for Gigi's Operating II, LLC. Accordingly, Debtors request authority to pay the prepetition Payroll Taxes.

80.     The Debtors retained Paylocity to submit and pay the Payroll Taxes to the appropriate governmental authorities, as well as Deductions to other entities. Prior to a pay day, Paylocity invoices Debtors for all upcoming payroll obligations including, but not limited to, Compensation, Employees' Deductions, Payroll Taxes, Employees' 401(k) withholding, the Debtors' portion of health insurance premiums and any other payroll deductions and obligations. The Debtors pay administrative fees each payroll period to Paylocity for payroll services. The fees are billed to the Debtors at the same time payroll is submitted for Debtors approval. Once

the Debtors approve the payroll, and upon Debtors' transfer of funds to FBS, Paylocity withdraws the payroll amount and its fees from FBS's bank account. Per pay period, the Debtors' administrative fees are approximately $385.00 for Corporate Employees; $218.00 for Gatti's Great Pizza, Inc. Store Employees; $131.00 for Gigi's Operating, LLC; and $61.00 for Gigi's Operating II, LLC Store Employees. The Debtors estimate that, as of the Petition Date, there was $795.00 in accrued but unpaid administrative fees to Paylocity.

81. The Debtors withhold from Employee Compensation certain amounts for loan payments, garnishment, and child support or other similar orders (together with the Payroll Taxes, the "Withholdings"). In connection with the Withholdings, the Debtors withhold the following approximate amounts, per pay period: $795.00 for Corporate Employees and $170.22 for Gatti's Great Pizza, Inc. Store Employees. Debtors estimate that, as of the Petition Date, the full amount owed has been withheld from Employee Compensation and remitted to the applicable third party.

82. The Debtors also reimburse reasonable Employee expenses (the "Expenses") incurred in the ordinary course of business subject to the Debtors' expense reimbursement policy through a combination of corporate credit cards and direct reimbursement to the Employee. Expenses may include travel expenses, meals, and entertainment, and for certain eligible Employees, data, internet, and similar such expenses. The Debtors issue corporate American Express credit cards (the "Corporate Credit Cards") for the payment of reimbursable Expenses to certain Employees on an as-needed basis, depending on the Employee's role with the Debtors and their projected travel requirements. The Debtors pay the reimbursable Expenses associated with the Corporate Credit Cards directly to the credit card company.

83.     From time to time, Employees also use their personal debit/credit cards (the "Personal Cards") for expenses.  Employees that incur Expenses on the Personal Cards submit a reimbursement request and, upon approval, the Debtors reimburse the Employees for such Expenses.

84.     The Debtors reimburse Employees on a bi-weekly basis, ordinarily through automatic clearinghouse payments or direct checks to the Employees.  Because of the irregular nature of requests for reimbursement of Expenses, it is difficult for the Debtors to determine the amount of unpaid Expenses at any given time.   The Debtors estimate that approximately $2,000.00 in Expenses are owed as of the Petition Date.

85.     **Employee Benefits:**  In the ordinary course of business, the Debtors also provide certain Employees (and their dependents) with access to a variety of benefits programs.  For Salaried Employees, these Employee Programs (collectively, the "Employee Benefits") include, but are not limited to (i) medical, dental, and vision care insurance; and (ii) life, accidental death, and dismemberment insurance, short-term and long-term disability insurance.   Hourly Employees are offered the Minimum Essential Coverage Plan (the "MEC Plan") administered by Ternian Insurance Group, and Debtors pay $54.95 per month for full-time Hourly Employees that elect coverage under the MEC Plan.

86.     By this Motion, the Debtors seek authority to (i) pay any pre-petition amounts owed on account of the Employee Benefits when due and payable in each case in the ordinary course of business and in accordance with pre-petition practices; and (ii) continue the Employee Benefits in the ordinary course of business post-petition.

87.     The Debtors sponsor several benefits plans.  These plans include, but are not limited to, the Debtors' medical, dental, vision, basic life and accidental death and

dismemberment, and long-term disability insurance, as well as electable coverages for supplemental life insurance and short-term disability benefits (collectively, the "Benefits Plans"). The Benefits Plans are administered by third-party insurers.

88.     The Debtors pay for all or a portion of the premium for some Benefit Plans while Employees pay a portion or all of the premium of some Benefit Plans.  The Gigi's Debtors pay approximately $4,300.00 per pay period for premiums of Benefit Plans on behalf of Corporate Employees.  The Gatti's Debtors pay approximately $6,600 per pay period for premiums of Benefit Plans on behalf of Corporate Employees.

89.     The type of Debtors' Employee medical and benefit plans, the providers and number of Corporate Employee participants are listed below:

| Type of Benefit Plan | Provider | Employee Participants |
|---|---|---|
| Health | Blue Cross Blue Shield | 34 |
| Dental | Blue Cross Blue Shield | 38 |
| Accident | AFLAC | 5 |
| Cancer Plan | AFLAC | 5 |
| Critical Illness | AFLAC | 5 |
| Vision | Dearborn | 29 |
| Life Insurance | Dearborn | 43 |
| Life - Accidental Death and Dismemberment | Dearborn | 43 |
| Long Term Disability | Dearborn | 43 |
| Short Term Disability | Dearborn | 43 |

90. Salaried Employees will be performing work between January 1, 2019 and the Petition Date. Therefore, a portion of premiums for Benefit Plans will have accrued and will be attributed to the prepetition period.

91. The Debtors pay for all or a portion of the premium for some Benefit Plans while Employees pay a portion or all of the premium of some Benefit Plans. The Gatti's Debtors pay approximately $681.00 per pay period for premiums of Benefit Plans on behalf of Store Employees. The Gigi's Debtors pay approximately $547.00 per pay period for premiums of Benefit Plans on behalf of Store Employees. In addition, there are 17 Store Employees, paid on an hourly basis, that participate in the MEC Plan.

92. The type of Debtors' Employee medical and benefit plans, the providers and number of Employee participants are listed below:

| Type of Benefit Plan | Provider | Employee Participants |
|---|---|---|
| Health | Blue Cross Blue Shield | 8 |
| Dental | Blue Cross Blue Shield | 4 |
| Accident | AFLAC | 3 |
| Cancer Plan | AFLAC | 3 |
| Critical Illness | AFLAC | 5 |
| Vision | Dearborn | 5 |
| Life Insurance | Dearborn | 9 |
| Life - Accidental Death and Dismemberment | Dearborn | 9 |
| Long Term Disability | Dearborn | 9 |
| Short Term Disability | Dearborn | 9 |

93. Salaried Employees will be performing work between January 1, 2019 and the Petition Date. Therefore, a portion of premiums for Benefit Plans will have accrued and will be attributed to the prepetition period.

94. As of the Petition Date, Debtors estimate a total of approximately $4,113.00 in prepetition premiums for Benefit Plans for Store Employees and Corporate Employees has accrued but remains unpaid. Accordingly, Debtors request authority to pay the prepetition amounts owed in connection with the Benefit Plans for Corporate Employees and Store Employees.

95. Also, former Employees are entitled to continue to participate in the Debtors' Medical Plan coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1986 (as amended, "COBRA") for up to 18 months post-employment (such coverage, the "COBRA Medical Coverage"). Failure to comply with the requirements of COBRA can subject the Debtors to monetary penalties, actions by the Department of Labor, and civil lawsuits by the former Employees to recover their benefits. *See, e.g.*, 29 C.F.R. § 2575.502c-6.

96. Former Employees who elect to participate in the COBRA Medical Coverage must pay a set amount, dependent on which type of plan they elect (*i.e.*, family, individual, etc.), to the Debtors' benefit provider, Aetna, Inc. As of the Petition Date, one of the Debtors' former Employees are currently on COBRA Medical Coverage. However, former Employees have 60 days following termination to make such election and the Debtors seek authority to continue participation as required by law.

97. To the best of the Debtors' knowledge, none of the Debtors' individual Employees are currently owed more than $12,850.00 on account of, in total, Employee

Compensation, Employee Benefits, Expense Reimbursement earned during the 180 days prior to the Petition Date.

98. I believe that the Debtors' payment of the Payment Obligations and Employee Benefits (collectively, the "Obligations") is essential to the Debtors' continued operations. Any delayed payment of or failure to pay the Obligations would negatively impact the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most critical and impose significant and needless financial hardship on their families. The Debtors' business operations cannot tolerate such disruption, nor should the Employees endure such hardship.

99. The Debtors do not seek to alter their compensation or other benefit policies at this time. This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with their existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their discretion, to continue to honor the Obligations with respect to their Employees that were in effect as of the Petition Date. Payment of the Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to continue to operate their businesses in an economic and efficient manner without disruption. The Employees are central to the Debtors' operations and are vital to this case. Payment of the Obligations is necessary to retain the skilled and motivated workforce essential to operate the Debtors' business. Accordingly, based on the foregoing, the Debtors submit that the requested relief is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

100.    I believe that it is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue to make payments for the charges incurred through use of Corporate Credit Cards and Personal Cards in accordance with the Debtors' reimbursement policy.  Accordingly, the Debtors seek authority to: (i) satisfy any and all pre-petition amounts due and owing to the Employees through Corporate Credit Cards and Personal Cards and to reimburse all outstanding pre-petition Expenses as they arise in the ordinary course of business; (ii) continue use of the Corporate Credit Cards and Personal Cards in place as of the Petition Date; and (iii) continue to pay all amounts due and owing to the Employees on account of the Expenses when due and payable in the ordinary course of business.

101.    I believe that it is essential that the Debtors continue to honor obligations to employees to ensure the continued operation of their business and to maintain the morale of their workforce.  The Debtors face the imminent risk that operations may be severely impaired if they are not immediately granted authority to honor the obligations to employees described in the Wage Motion.  Absent the requested relief, many of the employees may be unable to meet personal obligations, may be left without medical insurance, or may seek alternative employment opportunities.  Honoring the payment and program obligations to employees will, therefore, minimize business disruption and preserve employee loyalty during these cases.

102.    I believe that it is, therefore, essential for the continuation of Debtors' businesses post-petition, that the Debtors be authorized to:  (i) pay pre-petition payment and program obligations, including employee compensation and expense reimbursement, deductions, payroll taxes and other withholdings, and employee benefits programs, up to the priority expense limit imposed on employee claims under the Bankruptcy Code; and (ii) continue paying the payment and program obligations in the ordinary course of business.

103.    Accordingly, on behalf of the Debtors, I respectfully submit that the Wage Motion should be approved.

## H.    Programs Motion

104.    With the Programs Motion, Debtors request that the Court enter an order authorizing the Debtors to: (i) maintain and administer their Programs (as defined below); (ii) renew, replace, implement or modify their Programs; and (iii) pay and otherwise honor their obligations related to the Programs in the ordinary course of business consistent with the past practice and in the Debtors' business judgment.

105.    As owners and operators of various restaurants and/or stores, Debtors have developed various marketing strategies to generate business.  Among these strategies are certain customer programs, practices and promotions (collectively, the "Customer Programs") designed to enhance revenues and increase customer loyalty.   As of the Petition Date, the Customer Programs consist of (i) a customer gift card program and (ii) promotion programs.  The Debtors also have a program with franchisees which allows the franchisees the ability to use funds for marketing purposes (the "Franchisee Program" and collectively with the Customer Programs, the "Programs").

106.    In the ordinary course, Debtors offers customers the opportunity to purchase gift cards.  Gift cards are typically purchased by individuals in amounts of $20.00 or less. Currently, there are approximately 7,500 outstanding gift cards with an aggregate balance of approximately $77,000.00 for the Gatti's Debtors and approximately 29,000 outstanding gift cards with an aggregate balance of approximately $243,000 for the Gigi's Debtors[14].

---

[14] Approximately $80,000 of this amount corresponds to gift cards that were issued prior to December 31, 2015 and have had no activity for the last eighteen months.

107.    The Debtors seek authority to honor any gift card issued prepetition up to the outstanding balance on the card.  Honoring gift cards issued prepetition is necessary to maintain customer loyalty.  If prepetition gift cards are not honored, customer loyalty will suffer, negatively impacting the Debtors' attempts to reorganize.  Further, Debtors seek authority to continue to offer gift cards in order to generate additional revenue.

108.    The Debtors also have established several promotional programs for customers to utilize.  From time to time, the Debtors offer sale promotions of various kinds at the Debtors' restaurant and/or store locations and through targeted, direct marketing in order to enhance sales.  Such marketing promotions are shared via e-mail, texts and on social media.  The Debtors typically provide limited time offers, among other things, such as offering "bundles" (i.e. purchase of certain food items and receive a certain number of free games) to increase sales and customer loyalty.

109.    The Debtors seek authority to continue these promotion programs and honor associated discounts in the ordinary course of business, whether issued prepetition or post-petition, consistent with past practices.

110.    In addition, in order to increase growth, the Debtors have implemented a program with its various franchisees in which franchisees have the opportunity to utilize funds contributed by the franchisees to the Debtors for the purpose of marketing their respective locations.  The Debtors estimate that, as of the Petition Date, approximately $40,000.00 is owed to the franchisees in connection with the Franchisee Program.

111.    The Debtors seek authority to pay the prepetition amounts and continue this program in the ordinary course of business, consistent with past practices.

112.    I believe that the success of the Debtors' business is dependent upon the loyalty of the Debtors' customers as well as the support of the franchisees.  Consequently, continuation of the Programs is vital to maintaining the Debtors' value in the food services industry and necessary to the Debtors' reorganization.  If the Debtors are unable to honor the obligations under the Programs, the Debtors' brand and its franchise relations could be irreparably harmed.  Continuation of the Programs, however, will enable the Debtors to preserve their goodwill, retain customers and expand revenues.

113.    The Debtors' businesses rely heavily on customer loyalty and its franchisees, of which the Programs are an integral part. If the Programs are not honored, customer loyalty and franchisee relations may suffer, causing the Debtors immediate and irreparable harm that could negatively impact their attempts to reorganize.

114.    I submit that the relief requested in the Programs Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Programs Motion should be approved.

## I.      Request for Emergency Consideration

115.    Due to the nature of the relief sought in the First Day Motions, emergency consideration is essential.

## III.     CONCLUSION

116.    For the reasons stated herein and in each of the First Day Motions filed concurrently with the commencement of the Debtors' Cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the Declaration, is to the best of my information and belief, true and correct.

Fort Worth, Texas, this ___4th___ day of January, 2019.

 

Dawn M. Ragan, Chief Restructuring Officer for Sovrano, LLC; Mr. Gatti's, LP; Gatti's Great Pizza, Inc.; Gigi's Cupcakes, LLC; Gigi's Operating, LLC; Gigi's Operating II, LLC

DECLARATION OF DAWN M. RAGAN, CHIEF RESTRUCTURING OFFICER,
IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS
2830555v2

PAGE 42 OF 42