Jeffrey Cohen, Esq. (admitted *pro hac vice*)
Colorado Bar No. 10876
Anthony Garcia, Esq. (admitted *pro hac vice*)
Colorado Bar No. 49481
COHEN, LLC
1600 Broadway, Suite 1660
Denver, Colorado 80202
Tel: (303) 524.3636
Email: jcohen@cohentrial.com
      agarcia@cohentrial.com
*Attorneys for Certain Gigi's Cupcakes, LLC Franchisees*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 19-40067- ELM-11 |
| SOVRANO, LLC; | § | **Jointly Administered With:** |
| MR. GATTI'S, LP; | § | CASE NO. 19-40069-11 |
| GATTI'S GREAT PIZZA, INC.; | § | CASE NO. 19-40070-11 |
| GIGI'S CUPCAKES, LLC; | § | CASE NO. 19-40072-11 |
| GIGI'S OPERATING, LLC; | § | CASE NO. 19-40073-11 |
| GIGI'S OPERATING II, LLC; | § | CASE NO. 19-40074-11 |
| KEYCORP, LLC. | § | CASE NO. 19-40302-11 |
| | § | |
| | § | **(Chapter 11)** |

---

**FRANCHISEES' OBJECTION TO DEBTORS' FIRST OMNIBUS MOTION
PURSUANT TO 11 U.S.C. § 365 TO REJECT CERTAIN FRANCHISE
AGREEMENTS AND FRANCHISEES' ELECTION TO RETAIN RIGHTS UNDER
11 U.S.C. § 365(n)(1)(B)**

---

*\*\* This area intentionally left blank \*\**

I.

## TABLE OF CONTENTS

II.     TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

III.    THE POINTS OF DECISION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

IV.    THE SALIENT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

      A.     Relevant Background Giving Rise to Pre-Petition Litigation and
             Defaults in the UFAs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

      B.     Events Giving Rise to the Motion to Reject the Franchisees' UFAs . . . . . .   5

      C.     Franchisees' Election to Retain Rights Pursuant to 11 U.S.C.
             § 365(n)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

V.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

      Point I:    The majority view in the United States is that the Franchisees
             may retain the right to use trademarks and other intellectual
             property after the license is rejected pursuant to 11 U.S.C.
             § 365(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

      Point II:   Debtors' rejection of the Franchisees' UFAs is a bad faith
             retaliation that discriminates against the Franchisees for insisting
             that defaults in the UFAs be cured.  Malice is not sound
             business judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

II.

<u>TABLE OF AUTHORITIES</u>

**A.    Cases**

*Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.,*
930 S.W.2d 877 (Tex. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Grayling Lumber Co. v. Hemingway,*
194 S.W. 508 (Ark. 1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Crumbs Bake Shop, Inc.,*
522 B.R. 766 (Bankr. D.N.J. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Dan Hixson Chevrolet Co.,*
12 B.R. 917 (Bankr. N.D. Tex. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Exide Techs.,*
607 F.3d 957 (3d Cir. 2010), *as amended* (June 24, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*In re Pilgrim's Pride Corp.,*
403 B.R. 413 (Bankr. N.D. Tex. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15-16

*In re SIMA Int'l, Inc.,*
No. 17-21761 (JJT), 2018 WL 2293705 (Bankr. D. Conn. May 17, 2018) . . . . . . . . . . . 1, 6-11

*In re Tempnology, LLC,*
879 F.3d 389 (1st Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10, 12

*Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,*
756 F.2d 1043 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.,*
529 S.W.3d 413 (Tenn. Ct. App. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Riedlinger v. Steam Bros., Inc.,*
826 N.W.2d 340 (N.D. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Scott-Reitz Ltd. v. Rein Warsaw Assocs.,*
658 N.E.2d 98 (Ind. Ct. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC,*
686 F.3d 372 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10-11

*Wilson v. Kreusch,*
675 N.E.2d 571 (Ohio App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iii

**B.** **Statutes and Court Rules**

11 U.S.C. § 101(35A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11 U.S.C. § 365(n)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 8-9

11 U.S.C. § 365(n)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11 U.S.C. § 365(n)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*** This area intentionally left blank ***

4 Box, LLC; Gourmet Cupcakes, LLC; JJM, LLC; Koumbari Dolce, LLC; Morgan Foods, Inc.; Rylane Group, LLC; Sugar On Top Corporation; and Sugarlips Bakery, LLC (collectively, the "Franchisees"), through their counsel, COHEN, LLC, hereby submit this Objection to Debtors' First Omnibus Motion Pursuant to 11 U.S.C. § 365 to Reject Certain Franchisee Agreements (the "Motion") and Franchisees' Election to Retain Rights Under 11 U.S.C. § 365(n)(1)(B) (the "Objection and Election"). In support of this Objection and Election the Franchisees respectfully offer the following arguments and Appendix.

III.

THE POINTS OF DECISION

Under the majority view expressed in *In re SIMA Int'l, Inc.*, No. 17-21761 (JJT), 2018 WL 2293705 (Bankr. D. Conn. May 17, 2018) (selected for publication),[1] the Franchisees are allowed to continue using the Gigi's Cupcakes trademarks, even after rejection, pursuant to applicable non-bankruptcy law. As to the balance of Gigi's intellectual property, the Franchisees elect to retain their right to use such property pursuant to 11 U.S.C. § 365(n)(1)(B). In all events, capricious retaliation and discrimination against the Franchisees for insisting that defaults in their Unit Franchise Agreements ("UFAs") be cured is not using "sound business judgment." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 428 (Bankr. N.D. Tex. 2009). Debtors provide no logical methodology for selecting the Franchisees' UFAs for rejection and fail to explain how the Franchisees' UFAs are more burdensome than any other franchisee in the system. The Motion should be denied.

---

[1] A copy of this decision is incorporated on pages 1 through 10 of the Appendix for the convenience of the Court. It should be noted the issues presented therein were not discussed or addressed by the Debtors in the Motion.

IV.

<u>THE SALIENT FACTS</u>

**A.     Relevant Background Giving Rise to Pre-Petition Litigation and Defaults in the UFAs.**

The Franchisees are owners and operators of small franchised cupcake bakeries known as Gigi's Cupcakes located in several states throughout the U.S.  The Franchisees were licensed various forms of intellectual property from the original franchisor non-debtor, Gigi's Franchising, LLC ("Gigi's Franchising"), through UFAs[2] so that the Franchisees could take advantage of the Gigi's Cupcakes goodwill and benefit from the Gigi's Cupcakes business model.  Unbeknownst to the Franchisees, Gigi's Franchising had fraudulently misrepresented the viability of the Gigi's Cupcakes business model in the Franchisees' respective Franchise Disclosure Documents.

In 2016, Gigi's Franchising sold the UFAs to Debtor Gigi's Cupcakes, LLC ("Gigi's").[3]  Approximately one year later in mid-2017 Gigi's announced an abrupt system-wide 30% increase in prices for food, ingredients, and supplies that Franchisees were required to purchase through Gigi's' approved food distributors, including an 8% "proprietary markup" that was distributed directly to Gigi's.  In almost every case, the

---

[2] The Franchisees hereby incorporate in pages 11 through 76 of the Appendix the UFA of 4 Box, LLC, which is substantially similar to the UFAs of the other Franchisees.

[3] Technically, Debtor KeyCorp, LLC ("KeyCorp") signed the Asset Purchase Agreement ("APA") purchasing the UFAs, but contemporaneously with the closing of the APA, KeyCorp assigned its rights in the APA to Gigi's.  Franchisees reserve the right to argue in the future that KeyCorp held an equitable interest in the UFAs.

prices the franchisees were required to pay were far above prices the general consuming public could obtain from a wholesale distributor such as Restaurant Depot.

The drastic increase in cost of goods, combined with the already unviable business model, caused numerous Gigi's franchisees across the country to go out of business in short order.  The Franchisees in this action comprise some of the survivors who were fortunate enough to be the top performers in the Gigi's Cupcakes system.

Gigi's' abuses prompted some of the Franchisees and others in late 2017 to initiate the dispute resolution procedures in their respective UFAs, during which it was discovered that Gigi's had been insolvent since at least 2016 and had nevertheless made numerous transfers to its sole owner, KeyCorp, and other subsidiaries of KeyCorp, including, but not limited to, Debtor Sovrano, LLC ("Sovrano").  KeyCorp and its various subsidiaries are owned, with few exceptions, solely by R.J. Phillips, Jr. ("Phillips") and Kyle C. Mann ("Mann").

When it became clear that the Franchisees were going to sue the Debtors, Gigi's preemptively sued several Franchisees in the U.S. District Court for the Northern District of Texas.  It should be noted that Gigi's did not at that time, or in any pre-petition litigation thereafter, seek to terminate the Franchisees' UFAs like the Debtors do now with the instant Motion. Further, at no time have the Debtors asserted that the underlying litigation was unduly burdensome; indeed, it was Gigi's who initiated preemptive litigation against the Franchisees.

The Franchisees sued by Gigi's counterclaimed, and the remaining Franchisees filed their own complaints against the Debtors and others in the U.S. District Court for the Northern District of Texas and in Texas state court. [4]

The Franchisees hereby incorporate into in pages 77 through 132 of the Appendix the Complaint of Sugarlips Bakery, LLC, which is representative of the various claims brought by the Franchisees.  As described more fully in the Complaint the Franchisees assert claims for breach of contract against Gigi's for, *inter alia*, its failure to account for advertising and marketing funds, failure to provide adequate supply-chain pricing, failure to provide servicing to the Franchisees, and failure to develop and support products.

Subsequent to the commencement of litigation, Gigi's initiated a national online shipping program designed to siphon revenue away from brick-and-mortar franchisees to the benefit of Gigi's, which competition the Franchisees also assert is a breach of the UFAs.

---

[4] The following are citations to the cases between the Franchisees and the Debtors in the U.S. District Court for the Northern District of Texas: *Gigi's Cupcakes, LLC v. 4 Box, LLC, et al.*, **Case No.** 3:17-cv-3009; *Gourmet Cupcakes, LLC, et al. v. Gigi's Cupcakes, LLC, et al.*, **Case No.** 3:18-cv-2826; *Gigi's Cupcakes, LLC v. JJM, LLC, et al.*, **Case No.** 3:17-cv-3012; *Gigi's Cupcakes, LLC v. Koumbari Dolce, LLC, et al.*, **Case No.** 3:17-cv-3010; *Morgan Foods, Inc., et al. v. Gigi's Cupcakes, LLC, et al.*, **Case No.** 3:18-cv-2828; *Gigi's Cupcakes, LLC v. Rylane Group, LLC, et al.*, **Case No.** 3:17-cv-3013; *Sugarlips Bakery, LLC, et al. v. Gigi's Cupcakes, LLC, et al.*, **Case No.** 3:18-cv-2843.  The following citation is to a case between Franchisees in Texas and the Debtors in Texas state court, Dallas County division: *Sugar on Top Corporation, et al. v. Gigi's Cupcakes, LLC, et al.*, **Case No.** DC-18-16186.

**B.  Events Giving Rise to the Motion to Reject the Franchisees' UFAs.**

It was discovered that Equity Bank (the "Bank") issued a secured term loan of approximately $9,000,000 to Gigi's shortly before the Debtors filed for Bankruptcy; it does not appear that Gigi's repaid any portion the loan.  The Bank is the single major secured creditor in this proceeding.  It was also discovered that Phillips and Mann, the ultimate principals of the Debtors, executed personal guarantees of that loan to the Bank. (App. at 139).[5]

The Debtors filed for Chapter 11 bankruptcy between January 4, 2019 and January 25, 2019.  A sale of the Gigi's Cupcakes franchise system to MTY Franchising USA, Inc. (the "Purchaser") was proposed for a cash payment of $2,000,000.  On February 27, 2019 the Franchisees filed a written Objection expressing their intent to seek cures of the existing defaults in the UFAs.  Prior to that date none of the Debtors had indicated in any way that the Franchisees' particular UFAs were somehow more burdensome or onerous than any other franchisee in the Gigi's Cupcakes system in any way.  Nevertheless, on March 8, 2019 the Debtors filed the instant Motion asserting in conclusory fashion that the Franchisees' UFAs—and no other franchisee—were burdensome and not beneficial to the Purchaser.

The Franchisees are not opposed to the sale occurring; they simply want the defaults in their UFAs to be cured.  The Franchisees are willing to agree to allow the UFAs

---

[5] Evidence of the personal guarantees listed in Gigi's' Schedule H is incorporated into pages 133 through 140 of the Appendix.

to be assumed and assigned to the buyer to facilitate the sale so long as the sale proceeds are placed in escrow pending a determination of the cure amounts, which Franchisees agree to limit the total cure amount to $2,000,000.

**C.    Franchisees' Election to Retain Rights Pursuant to 11 U.S.C. § 365(n)(1)(B).**

Pursuant to 11 U.S.C. § 365(n)(1)(B) and the majority view expressed in *In re SIMA Int'l, Inc.*, No. 17-21761 (JJT), 2018 WL 2293705 (Bankr. D. Conn. May 17, 2018), the Franchisees hereby elect to retain their rights to use Gigi's' intellectual property and trademarks in the event their UFAs are rejected.

V.

ARGUMENT

POINT I

THE MAJORITY VIEW IN THE UNITED STATES IS THAT THE FRANCHISEES MAY RETAIN THE RIGHT TO USE TRADEMARKS AND OTHER INTELLECTUAL PROPERTY AFTER THE LICENSE IS REJECTED PURSUANT TO 11 U.S.C. § 365(a).

While the Franchisees believe that the Debtors' rejection of the Franchisees' UFAs is grounded more in retaliation than any legitimate business judgment as explained in Point II, *infra*, in any event, the Franchisees elect to retain their rights under the UFAs pursuant to 11 U.S.C. § 365(n)(1)(B) and the majority view relating to trademark licenses.[6]

---

[6] It appears there is no controlling precedent in this jurisdiction regarding the effect of rejection to trademark licensees, and it is an issue of first impression.

In a thorough and well-reasoned opinion that adopts the majority view of the Third Circuit,[7] Seventh Circuit,[8] and the District of Connecticut,[9] the court in *In re SIMA*, 2018 WL 2293705 (App. at 1-10)[10] explained the history and purpose of 11 U.S.C. § 365(n) as well as the current state of the law regarding rejection of trademark licenses. The court in *In re SIMA* held that rejection of a trademark license is a breach—not a termination— by the licensor, so the trademark licensee looks to applicable state law[11] to determine whether the breach precludes the licensee from using the licensed trademarks. *Id.* at *8- *9.

In *In re SIMA*, the debtor was the licensor of a proprietary and trademarked behavioral analysis system known as "SIMA." *Id.* at *1. SIMA was licensed to non-debtor Marlys Hanson, Inc. ("MHI") (the "SIMA License"), which license MHI used and relied on to create and develop a software adaption of SIMA known as "CAPS." *Id.* at *2. The debtor subsequently filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code and made a motion to reject the SIMA Lease, asserting (like the Debtors in the case at bar) that rejection of the SIMA Lease would increase the value of the intellectual property in a bankruptcy sale. *Id.* MHI objected and elected pursuant to 11

---

[7] *In re Exide Techs.*, 607 F.3d 957, 965 (3d Cir. 2010).

[8] *Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC,* 686 F.3d 372 (7th Cir. 2012).

[9] *In re SIMA*, 2018 WL 2293705. (App. at 1-10).

[10] The minority view is expressed by the First Circuit. *In re Tempnology, LLC*, 879 F.3d 389 (1st Cir. 2018).

[11] The discussion related to applicable state law is discussed on page 12, *infra.*

U.S.C. § 365(n)(1)(B) to retain its rights to use the SIMA trademarks and the right of exclusivity granted in the SIMA Lease. *Id.*

The court noted that Congressional enactment of 11 U.S.C. § 365(n) was a direct remedial response to the misguided Fourth Circuit decision in *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043 (4th Cir. 1985) in which it was held that a technology licensee lost all rights to use the licensed technology upon rejection of the lease because the rejection amounted to breach and termination. *In re SIMA,* 2018 WL 2293705 at *4.

Under 11 U.S.C. § 365(n),

(1) If the trustee rejects an executory contract[12] under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect--

* * *

(B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for--

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

---

[12] There is no legitimate dispute that the UFAs are executory contracts because performance remains due from both Gigi's and the Franchisees. *See In re Dan Hixson Chevrolet Co.,* 12 B.R. 917, 923 (Bankr. N.D. Tex. 1981) ("[A]n executory contract is one in which 'performance remains due to some extent on both sides; that is, when neither side has fully performed.'").

Further, under 11 U.S.C. § 365(n)(2), "if the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—(A) the trustee *shall* allow the licensee to exercise such rights . . . ." (emphasis added).  Likewise, upon written request of the licensee making the (n)(1)(B) election,

> the trustee *shall*--
>
> > (A) to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and
> >
> > (B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

11 U.S.C. § 365(n)(3) (emphasis added).

"Through this provision, Congress sought 'to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy.'" *In re Exide Techs.*, 607 F.3d 957, 965 (3d Cir. 2010), *as amended* (June 24, 2010) (quoting S. Rep. No. 100-505, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3200).  "Thus, in the event that a bankrupt licensor rejects an intellectual property license, Section 365(n) would now explicitly allow a licensee to retain its licensed rights for the contract's duration, as such rights existed immediately prior to the bankruptcy." *In re SIMA*, 2018 WL 2293705 at *4.

However, because "trademarks" were not included in the definition of "intellectual property" in 11 U.S.C. § 101(35A), a number of courts concluded by

"negative inference" that 11 U.S.C. § 365(n) was not intended to protect trademark licensees, and, as a result, the *Lubrizol* reasoning operated by default to cause trademark rights to lapse upon rejection of the trademark lease. *Id*. at \*6. In 2012, the Seventh Circuit in *Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC,* 686 F.3d 372 (7th Cir. 2012) contradicted the *Lubrizol* reasoning, holding that a plain reading of 11 U.S.C. § 365(g), which provides that a debtor is not subject to specific performance of a contract after the contract is rejected, does not imply that the trademark licensee's rights are vaporized upon rejection. *In re SIMA*, 2018 WL 2293705 at \*7. Rather, the *Sunbeam* court held that rejection acts as the licensor's breach of contract without a termination, which consequently allows the licensee to continue using the trademark. *Id*.

In 2014, the U.S. Bankruptcy Court for the District of New Jersey in *In re Crumbs Bake Shop, Inc.,* 522 B.R. 766 (Bankr. D.N.J. 2014) rejected the "negative inference" approach and concluded that Congress' omission of trademarks from the definition of intellectual property was meant to allow bankruptcy courts to use their equitable powers to decide on an *ad hoc* basis whether § 365(n) protects trademark licensees. *In re SIMA*, 2018 WL 2293705 at \*7.

In a decision criticized by the court in *In re SIMA*, the First Circuit in *In re Tempnology, LLC,* 879 F.3d 389 (1st Cir. 2018) attempted to effectively resurrect the *Lubrizol* rationale by holding that allowing a trademark licensee to continue using the trademark after the license is rejected would place an undue burden on the debtor licensor to monitor the use of the trademark. *In re SIMA*, 2018 WL 2293705 at \*7. The court in *In re*

10

*SIMA* found this reasoning unpersuasive and contrary to clear Congressional intent "to rebalance the intellectual property rights of license counterparties." *Id.*

Finally, the court in *In re SIMA* adopted the reasoning of the Seventh Circuit in *Sunbeam*, holding that "[t]he effect of rejection of an executory contract or unexpired lease is limited to a breach or abandonment by the trustee or debtor in possession rather than a complete termination." *Id.* at *8. "[R]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear." *Id.* Hence, the court in *In re SIMA* looked to governing state law to decide whether the debtor's breach terminated MHI's right to continue using the SIMA trademark after rejection of the SIMA License. *Id.*

In the case at bar, the UFAs recite that the franchisor developed the right to license—and did license[13]—to Franchisees

> a distinctive business format system (the "System") for the establishment, development and operation of retail stores specializing in the preparation, packaging and sale of cupcakes and other foods, beverages, goods and services . . . that operate in locations that display distinctive trade names, trademarks, service marks, and other indicia of origin and interior and exterior trade dress (the "Proprietary Marks") . . . .

(App. at 13, Recital B, at A-1).[14] Hence, the UFAs license to the Franchisees trade secrets (*e.g.* proprietary recipes) subject to 11 U.S.C. § 365(n) as well as Gigi's trademarks.

In the absence of guiding Fifth Circuit precedent, this Court should adopt the reasoning of the *In re SIMA* court as well as the Seventh Circuit in *Sunbeam*; it is clear that

---

[13] *See* App. at 13-14, Section 1.1 (Initial Grant), at A-1 through A-2. The same or substantially similar provision appears in all other UFAs of the Franchisees.

[14] The same or substantially similar recitation appears in all other UFAs of the Franchisees.

the reasoning of *Tempnology* is contrary to the intention of Congress and would lead to a harsh and inequitable result. Thus, this Court should look to applicable state law to determine the effect of Gigi's' breach of the UFAs. Here, the UFAs each provide that Tennessee law governs; however, the laws of Indiana, North Dakota, Arkansas, Ohio, and Texas have statutes that may override and void the choice of law provisions in the UFAs of Franchisees in those states.

Under Tennessee law, a material breach gives the non-breaching party the <u>*option*</u> to terminate the contract but does not necessarily cause the termination of a contract. *See M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 424 (Tenn. Ct. App. 2016). Likewise, the laws of the Indiana, North Dakota, Arkansas, Ohio, and Texas provide the same. *See Grayling Lumber Co. v. Hemingway*, 194 S.W. 508, 509 (Ark. 1917); *Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 103–04 (Ind. Ct. App. 1995); *Riedlinger v. Steam Bros., Inc.*, 826 N.W.2d 340, 349 (N.D. 2013); *Wilson v. Kreusch*, 675 N.E.2d 571, 576 (Ohio App. 1996); *Chilton Ins. Co. v. Pate & Pate Enterprises, Inc.*, 930 S.W.2d 877, 887–88 (Tex. App. 1996), *writ denied* (Feb. 13, 1998).

Hence, the Franchisees should not be required to treat the UFAs as terminated and should be allowed to continue using Gigi's' trademarks and other intellectual property.

<u>POINT II</u>

<u>DEBTORS' REJECTION OF THE FRANCHISEES' UFAs IS A BAD FAITH RETALIATION THAT DISCRIMINATES AGAINST THE FRANCHISEES FOR INSISTING THAT DEFAULTS IN THE UFAs BE CURED. MALICE IS NOT SOUND BUSINESS JUDGMENT.</u>

In a bare-bones conclusory recitation in paragraphs 10, 15, and 16 of the Motion that rejection of the Franchisees' UFAs is within the Debtors' "sound business judgment," the Debtors avoid revealing the true purpose for the Motion: to be punitive and to retaliate against the Franchisees for insisting that the defaults in their UFAs be cured prior to their assumption and assignment to the Purchaser.

There is no legitimate reason why the _Debtors_ should be concerned about litigating the merits of and cure amounts for the defaulted UFAs: the Bank is a secured creditor for over $9,000,000, and it is obvious that no amount of the $2,000,000 purchase price will be available to the bankruptcy estate for distribution to general unsecured creditors. Hence, it is only the Bank and the Franchisees—not the Debtors—who should be concerned about who receives what portion of the $2,000,000.

The reason for the Debtors' retaliatory rejection of the Franchisees' UFAs becomes clear when observing that the Debtors' ultimate principals, Phillips and Mann, signed personal guarantees to the Bank (App. at 139), giving the Debtors and their principals an incentive to ensure the Bank gets repaid as much as possible from the purchase price. In other words, the more money the Bank receives from the purchase price, the less money Phillips and Mann will personally need to repay the Bank. By rejecting the UFAs whose Franchisees seek to have their defaults cured with cash, Phillips and Mann achieve their hidden objective. This sort of collusion between the Debtors and their insiders is the epitome of bad faith.

It is no coincidence that the _only_ UFAs selected for rejection are those belonging to the Franchisees who have been engaged in pre-petition litigation with the Debtors and who recently indicated their objection to the sale if the defaults in their UFAs were not cured.  Debtors state in conclusory fashion in Paragraph 15 of the Motion that they have "evaluated which contracts and leases are beneficial to a potential purchaser" and that the Franchisees' UFAs are "not necessarily beneficial to the estates nor are they necessarily beneficial to a potential purchaser."

However, the Motion identifies no methodology for rejecting the UFAs of Franchisees, who comprise roughly 18% of the top performing stores in the Gigi's Cupcakes system.  Also absent from the Motion is any explanation regarding _how_ the Franchisees' particular UFAs are more financially burdensome than other franchisees in the Gigi's Cupcakes system or how a potential buyer would be benefitted by purchasing fewer royalty-producing UFAs from the top performing Franchisees in the system.[15]  This is not an allegation that has ever been made by the Debtors in any pre-petition litigation to date.

Indeed, the Debtors admitted in Paragraph 10 that the only reason they seek to reject the Franchisees' UFAs is because the Franchisees insisted that the defaults in their UFAs be cured and the Debtors do not wish to delay the sale. If the Debtors were willing

---

[15] If the Purchaser is willing to pay the same price for roughly 18% less royalty revenue than it was anticipating before the Motion, Franchisees suspect there is an ulterior motive for the sale and an element of collusion between the Debtors and the Purchaser that should be examined by the Court.

to assume and assign the Franchisees' UFAs before—but not after—the Franchisees' objection, it is logical to conclude that it was the Franchisees' objection that prompted the Motion.  This is retaliation.  The Debtors seem to rely heavily on a misplaced aspiration that incanting the words "sound business judgment" in a motion is enough to avoid scrutiny of the Debtors' decision.

"In applying the business judgment rule in deciding whether to grant a debtor's motion to reject a contract a court is not adjured to blindly accept, but rather only to show proper deference to the business judgment of the debtor's management." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009).  The Court's role is not simply to be a rubber stamp. *Id.* at n.31.  Rather, "a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession. . . . The court must ensure the decision-making process used by a debtor in possession in exercising its powers under the Code is a sensible one." *Id.* at 427.  "[A] decision to reject may not be the result of whim, caprice or bad faith." *Id.*  "If Debtors have better or approximately equal economic options and selected the . . . contracts for rejection on a *discriminatory* or *retaliatory* basis, their decision-making process was not rational" and the Motion should be denied. *Id.* at 428 (emphasis added).

It is clear from the lack of methodology or explanation in the Debtors' Motion and the dubious motives of the Debtors and their principals that their request to reject the Franchisees' UFAs is not based on "sound business judgment" but, rather, is a product

15

of bad faith and capricious retaliation and discrimination.  The Motion should be denied. *See id*. at 428.

VI.

CONCLUSION

If the Court does not deny the Motion, the Court should issue an order authorizing the Franchisees to retain their rights in Gigi's' intellectual property—including Gigi's' trademarks.  However, because it is clear that the Debtors are retaliating and discriminating against the Franchisees for insisting their UFAs be cured of defaults, and because the Debtors are not using their business judgment in seeking to reject the Franchisees' UFAs, the Court should deny the Motion.


DATED: March 13, 2019                    Respectfully submitted,

                                         COHEN, LLC

                                         By: */s/ Jeffrey Cohen*
                                             Jeffrey Cohen, Esq.**
                                             Anthony Garcia, Esq.**
                                             COHEN, LLC
                                             1600 Broadway, Suite 1660
                                             Denver, Colorado 80202
                                             Tel: (303) 524.3636
                                             Email: jcohen@cohentrial.com
                                                     agarcia@cohentrial.com
                                             ***Attorneys for Certain Gigi's Cupcakes, LLC Franchisees***
                                             *** Admitted Pro Hac Vice*

<u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on March 13, 2019 the foregoing document was electronically filed and served via PACER/ECF to all persons entitled to notice.

*/s/  Anthony A. Garcia, Esq.*